| | |
|---|---|
| **HUBERT LEE ALLEN,**<br> Plaintiff,<br>v.<br><br>**LOWELL GRIFFIN**, In his Official Capacity as Sheriff of Henderson County; **JAMES MCCLURE**, Individually; **BRADY GARREN**, Individually; and **WESTERN SURETY COMPANY,** as Surety on the Official Bond of Sheriff Lowell Griffin,<br> Defendants. | **COMPLAINT**<br>**(JURY)**<br>**Case No. 1:26-cv-00172** |

NOW COMES Plaintiff, complaining of the Defendants, and alleges and says as follows:

## INTRODUCTION

1. Plaintiff, Hubert Lee Allen, brings this action seeking legal and equitable relief under 42 U.S.C. Section 1983 and the laws of the State of North Carolina to redress the use of objectively unreasonable and excessive force by law enforcement officers of the Henderson County Sheriff's Office under Sheriff Lowell Griffin. Defendants McClure and Garren repeatedly deployed conducted electrical weapons ("CEWs" or "Tasers,") and applied substantial physical force against Plaintiff, a non-violent, unarmed individual on his own premises who posed no immediate threat and was experiencing a perceived mental health episode. The force used was disproportionate, caused Plaintiff severe injury and violated his clearly established constitutional rights.

## JURISDICTION AND VENUE

-1-

2. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and the State of North Carolina.

3. Subject matter jurisdiction of the Court for all claims set forth hereinbelow is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367; and under the doctrine of pendent jurisdiction.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as all events giving rise to the claims occurred in Henderson County, North Carolina, within this judicial district; furthermore, Plaintiff resided, at the time of the incidents complained of herein, in Henderson County and currently resides in Rutherford County, North Carolina.

5. At all relevant times complained of herein, Defendants acted under color of state law.

6. This Court also has personal jurisdiction over all parties in this action pursuant to North Carolina General Statutes Section 1-75.4.

**<u>PARTIES</u>**

7. Plaintiff, Hubert Lee Allen, at all times relevant to this Complaint, was a citizen and resident of Henderson County, North Carolina; at the institution of this action, he is a resident of Rutherford County, North Carolina; and brings this action against Defendants in his own capacity.

8. That, at all other relevant times herein, Defendant Sheriff Lowell Griffin (hereinafter "Griffin" or "Sheriff Griffin") was the elected Sheriff of Henderson County, North Carolina, and the final policymaker of and in charge of the Henderson County Sheriff's Office/Department and all non-delegable aspects thereof; and, for the purposes of setting lawful departmental policy, was acting within the scope of his authority. On information and belief, Defendant Griffin is a citizen and resident of Henderson County, North

Carolina.

9. That, on April 30, 2024, Sheriff Griffin, pursuant to North Carolina General Statutes Section 162-8, was obligated under state law to obtain and maintain a surety bond and thereby waived governmental immunity to the extent provided by North Carolina law and the applicable bond statutes.

10. In addition, Sheriff Griffin:

   a. Through Henderson County or otherwise, upon information and belief, governmental immunity has been waived to the extent of applicable insurance coverage, participation in a risk pool, or operation of the sheriff's official bond; and

   b. Is liable in his official capacity for his actions set forth hereinbelow exercised improperly within the scope of his lawful authority.

11. That Defendants McClure and Garren (hereinafter "McClure" and "Garren"), at all times relevant herein, were law enforcement personnel employed by Sheriff Griffin and the Henderson County Sheriff's Office and subject to the direction and control of Defendant Griffin. Under the circumstances described hereinafter, to the extent permitted by North Carolina law governing official-capacity liability, agency, and respondeat superior, the actions of McClure and Garren are deemed to be the actions of Defendant Sheriff Griffin and he is liable for their wrongful acts.

12. That Defendants McClure and Garren were on duty on or about April 30, 2024, acting in their capacities as law enforcement officers of the Henderson County Sheriff's Department, and exceeded the scope of their lawful authority when they encountered Plaintiff as set forth in the facts alleged hereinbelow.

-3-

13. That McClure and Garren are or were residents of Henderson County, North Carolina, and remain employed by the Henderson County Sheriff's Office despite the incident that is subject to departmental oversight by policy and is the subject of this Complaint. Each is sued in their individual capacities.

14. That Western Surety Company was the Surety of Sheriff Griffin on April 30, 2024, and, at all times relevant to this Complaint, the Defendant(s) Surety was/were registered to serve as Surety in the State of North Carolina and served as the Surety for Sheriff Griffin, pursuant to North Carolina General Statutes 58-76-5 and, as such, is liable under N.C. Gen. Stat. § 162-8 and 162-12 for the tortious actions of Sheriff Griffin and his deputies/law enforcement personnel and employees as described hereinafter in this Complaint to the extent of its Surety Bond.

15. That, on April 30, 2024, the Surety had in place the statutorily mandated surety bond to cover any injury caused by the misconduct of the Sheriff or those in his employ and under his control, including McClure and Garren.

16. All Defendants other than Western Surety Company are persons within the meaning of 42 U.S.C. § 1983.

## FACTS

17. That Plaintiff, Hubert Lee Allen, re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

18. That Defendant Griffin and the Henderson County Sheriff's Department are the employers of Defendants McClure and Garren.

19. That the allegations set forth herein are corroborated by law enforcement "body-cam" video footage produced to Plaintiff initially in discovery without Court Order.

20. That, on April 30, 2024, Plaintiff was lawfully present upon the premises of his home in Henderson County, North Carolina, in a camper near the front entrance to his residence.

21. That, unbeknownst to Plaintiff, a residential fire had ignited in his residence while Plaintiff was occupied in his camper.

22. That emergency First Responders arrived on the scene and requested that Plaintiff remove himself from his camper and move away from the front entrance of his residence; Plaintiff was permitted to move with his canine to his motor vehicle further from the entrance to his residence while First Responders attended to the fire.

23. That Plaintiff was not unruly with First Responders.

24. That Defendant McClure arrived on the scene aware that Plaintiff had a minor outstanding misdemeanor warrant, later dismissed by the State; he was joined by Defendant Garren and neither defendant had possession of the misdemeanor warrant.

25. That, upon approach to the area of Plaintiff's home, McClure announced his arrival to First Responders by asking: "Where's your pissed off person?" *(Exhibit P-1[1], McClure Body-Cam video at 12:48:20, Elapsed Time Stamp 0:02:34).*

26. That McClure and Garren were informed by First Responders of the circumstances on the premises and, in general terms, that Plaintiff was exhibiting fear and confusion (*Exhibit P-1[2], McClure Body-Cam video at approximately 12:49:43, Elapsed Time Stamp 0:03:57)* and by a person unknown to them present on the scene that Plaintiff may be experiencing a mental health crisis *(Exhibit P-1[3], McClure Body-Cam video at approximately 12:51:17, Elapsed Time Stamp 0:05:31).*

27. That, based on the foregoing, McClure and Garren knew or should have known that Plaintiff was exhibiting signs of a mental health crisis or significant mental distress and,

from thenceforth, treated Plaintiff in conformity therewith.

28. That, upon arrival, McClure and Garren were able to observe that the fire was substantially contained, with no visible flames, and that no exigent threat existed to require immediate intervention; the First Responders were calm with limited activity by personnel present and the remainder standing-by in observation *(Exhibit P-1[4], McClure Body-Cam video at 12:48:09; Elapsed Time Stamp 0:02:23);* and, at all times memorialized by the body-cam video footage of McClure and Garren, the reaction of the First Responders to the conditions at the scene of Plaintiff's home remained unchanged.

29. That, throughout the incident, Plaintiff did not actively interfere with the actions of First Responders.

30. That, prior to initiating contact with Plaintiff, McClure further had been informed of the identity and address of Plaintiff *(Exhibit P-1[5], McClure Body-Cam video at 12:49:12; Elapsed Time Stamp 0:03:27)* and knew, observed or became informed by individuals at the scene that:

    a. Plaintiff resided on the premises;

    b. Plaintiff was presently seated in his own vehicle on a downhill slope facing away from his mobile home, without keys and that the transmission was 'not in gear' *(Exhibit P-1[6], McClure Body-Cam video at 12:51:56; Elapsed Time Stamp 0:06:10)*;

    c. The motor vehicle in which Plaintiff was seated was held in place by a wheel stop/"chock" *(Exhibit P-1[7], McClure Body-Cam video at 12:52:40; Elapsed Time Stamp 0:06:54)*; and

d. Plaintiff was suspicious of the presence and motives of law enforcement on his premises: Specifically, that: "(E)very time (Plaintiff) sees a uniform, he gets terrified…he is (suffering from a mental health condition)…" *(See Exhibit P-1[3], paragraph 26)*.

31. That McClure advised others on the scene that Plaintiff would be removed peacefully or otherwise *(Exhibit P-1[8], McClure Body-Cam video at 12:51:37; Elapsed Time Stamp 0:05:51)*; however, despite the foregoing knowledge, McClure did not change his approach or plan to remove Plaintiff from his vehicle.

32. That the Henderson County Sheriff's Office during the term of Defendant Griffin has a history of incidents resulting in allegations of excessive force and related civil litigation; and Defendants McClure and Garren knew or should have known of both that history and of Defendant Griffin's tolerance of such misconduct prior to April 30, 2024, as set forth below.

33. That Garren attempted to cajole Plaintiff into exiting the vehicle; however, McClure approached Plaintiff and, a mere seven minutes from arriving on the scene, aggressively ordered Plaintiff to exit his vehicle: "Get the f*** out of the car, NOW!" *(Exhibit P-1[9], McClure Body-Cam video at 12:53:13, Elapsed Time Stamp 0:07:28)*; and instructed Garren to disengage: "Shut your mouth, Brady;" *(Exhibit P-1[10], McClure Body-Cam video at 12:53:20; Elapsed Time Stamp 0:07:34)*.

34. That, under influence of fear and confusion, Plaintiff did not immediately comply voluntarily with the demand of Defendants to extricate himself from his motor vehicle, expressing consternation as to why the deputies wanted to remove him from the safety of his vehicle: "What is it I'm doin'?" *(See Exhibit P-1[9], McClure Body-Cam video at*

*12:53:13, Elapsed Time Stamp 0:07:28).*

35. That Plaintiff screamed in fear and pain as McClure and Garren escalated their encounter with Plaintiff and attempted to seize him by violence and intentional infliction of pain and injury (*See Exhibits P-1[13]-P-1[18]).*

36. That Plaintiff, under assault of increasing violence, remained seated in his vehicle, afraid to exit; unable to flee.

37. That, prior to the use of force by McClure and Garren, Plaintiff was not suspected of a serious crime, was not placed under arrest, posed no immediate threat and did not attempt to flee.

38. That, in addition, Plaintiff was:

   a. Unarmed;

   b. Lawfully upon his premises seated in his motor vehicle; and

   c. Non-violent, engaging in neither assaultive nor threatening conduct *(Exhibit P-1[11], McClure Body-Cam video 12:52:47; Elapsed Time Stamp 0:07:01).*

39. That Plaintiff's behavior consisted solely of noncompliance driven by the actions of McClure and Garren; begging to be 'let go;' pleading as to why he was under assault and being ordered to withdraw from the safety of his vehicle *(Exhibit P-2[1], Garren Body-Cam video at 12:53:57, Elapsed Time Stamp 0:05:47)*; exposing himself to "snipers," *(Exhibit P-1[12], McClure Body-Cam video at 13:18:08; Elapsed Time Stamp 0:32:22)* which Garren previously had confirmed outside the presence of Plaintiff *(Exhibit P-2[2], Garren Body-Cam video at 12:51:02; Elapsed Time Stamp 0:02:52).*

40. That, despite the foregoing, neither McClure nor Garren adjusted their approach despite their perception and observation of Plaintiff's condition: They failed to request assistance

-8-

of mental health professionals; seek guidance from superiors; or otherwise attempt to accommodate what they perceived as Plaintiff's mental health crisis in any way, including, but not limited to, employing less violent and aggressive means of gaining compliance from Plaintiff to leave or move his vehicle, such as by merely removing Plaintiff's vehicle peacefully from the proximity of the smoldering mobile home by removing the clearly visible wheel safety "chock" in front of the right rear wheel and, with assistance of others, easing the vehicle gently down the slope.

41.   That, notwithstanding the foregoing facts, McClure and Garren further escalated their encounter by initiating forcible extraction of Plaintiff from his vehicle by assault and battery; and, failing in that, McClure deployed and discharged his "Taser" despite Plaintiff cowering in his motor vehicle *(Exhibit P-1[13], McClure Body-Cam video at 12:55:00; Elapsed Time Stamp 0:09:14)*.

42.   That, when McClure's initial deployment of his "Taser" failed to produce compliance from Plaintiff, despite the excruciating pain inflicted upon him, Plaintiff desperately attempted to avoid the officers, remaining as far from each of them as possible in the cramped confines of the vehicle.

43.   That, failing to gain the extraction of Plaintiff from the vehicle, McClure then ordered Garren to "tase" Plaintiff a second time: "Another hit, Brady!" *(Exhibit P-1[14], McClure Body-Cam video at 12:55:21; Elapsed Time Stamp 0:09:35)*; without questioning the order to further 'tase' a cornered and defenseless man, Garren complied and fired a second electrical charge into Plaintiff's body.

44.   That at no time did Plaintiff seek to 'fight back' or otherwise defend himself.

45.   That, after the initial two deployments failed to produce compliance, McClure then

ordered Garren to 'tase' Plaintiff a third time ("Hit him again!"), notwithstanding Plaintiff's visible distress and incapacitation; an order with which Garren again complied *(Exhibit P-1[15], McClure Body-Cam video at 12:55:41; Elapsed Time Stamp 0:09:55)*, in violation of Defendant Griffin's departmental policy limiting Taser discharges against an individual.

46. That, during the escalating use of force, Plaintiff's dog had remained peacefully under control of Plaintiff within the vehicle until approximately the second 'tasing' of Plaintiff, at which point the dog became agitated, lost control and caused severe injury to Plaintiff's left ear and face/eye.

47. That, upon observing the facial injuries to Plaintiff, McClure changed tactics to coax Plaintiff from his vehicle by imploring: "Just get out and we can help you." *(Exhibit P-1[16], McClure Bodycam video at 12:56:31; Elapsed Time Stamp 0:10:45)*; however, as Plaintiff continued to cry for help and pleading, "quit…quit…," McClure resumed his use of excessive force by attempting to drag Plaintiff forcibly from the passenger side of the vehicle by his left leg *(Exhibit P-1[17], McClure Body-Cam video at 12:55:58; Elapsed Time Stamp 0:10:13)*.

48. That rather than wait for the arrival of 'Animal Control,' approximately fifteen minutes hence *(Exhibit P-2[8], Garren Body-Cam video at 13:12:29; Elapsed Time Stamp 0:24:19)*, Defendant Garren circled back to the driver's side of the vehicle and called back to McClure: "I'm going to 'tase' the dog!" *(Exhibit P-2[3], Garren Body-Cam video at 12:57:03; Elapsed Time Stamp 0:08:53)*.

49. That Garren 'tased' the dog at least once as it sat non-aggressively in the driver's seat *(Exhibit P-2[4], Garren Body-Cam video footage at approximately 12:57:06; Elapsed*

*Time Stamp 0:08:56)*; simultaneous with 'tasing' the dog, Garren yelled to McClure, "Get (Plaintiff) out, Jamie!" *(Exhibit P-2[5], Garren Body-Cam video footage at approximately 12:57:10; Elapsed Time Stamp 0:09:00).*

50.    That, upon being 'tased,' the dog lurched back to Plaintiff's side of the vehicle and temporarily wedged itself between Plaintiff and the dashboard close to McClure.

51.    That, with the dog back on his side of the vehicle, McClure responded, "I can't!" *(Exhibit P-2[5], Garren Body-Cam video at approximately 12:57:10; Elapsed Time Stamp 0:09:00).*

52.    That McClure forcefully kicked Plaintiff on his injured right hip and leg while Plaintiff pleaded: "Quit, man!  Quit!...Quit, man!...I can't get out!"; at this point, McClure was no longer demanding that Plaintiff exit the vehicle *(Exhibit P-1[18], McClure Body-Cam video at approximately 12:57:25; Elapsed Time Stamp 0:11:38).*

53.    That, even with the dog now in Plaintiff's lap but showing no aggression, McClure proceeded to slam the car door on Plaintiff's right ankle and foot violently as Plaintiff screamed *(Exhibit P-1[19], McClure Body-Cam video at approximately 12:58:30; Elapsed Time Stamp 0:12:44).*

54.    That Plaintiff thereafter collapsed and both he and his dog were prone in the front seat of the vehicle *(Exhibit P-2[6], Garren Body-Cam video at approximately 13:00:25; Elapsed Time Stamp 0:12:15).*

55.    That McClure and Garren finally relented in their assaultive conduct, with Garren explaining to McClure that he could "shoot the dog where it's at but its kind of a crappy situation with all these people out here" *(Exhibit P-2[7], Garren Body-Cam video at 13:07:40; Elapsed Time Stamp 0:19:30)*; within five (5) minutes, Plaintiff's canine was

-11-

removed from the vehicle by an animal control officer without incident *(Exhibit P-2[8], Garren Body-Cam video at 13:12:29; Elapsed Time Stamp 0:24:19)*.

56. That, throughout the events complained of, multiple other law enforcement officers of Defendant Griffin and First Responders witnessed the excessive force inflicted upon Plaintiff by McClure and Garren; but, even when Garren implored anyone else to assist in removing Plaintiff from his vehicle, virtually no one even moved in response to his request *(Exhibit P-2[9], Garren Body-Cam video at 12:57:44; Elapsed Time Stamp 0:09:34)*.

57. That, awaiting arrival of an ambulance, McClure stated: "If he wants his ear treated, he'll get it treated 'when he gets out.'" *(Exhibit P-1[20], McClure Body-Cam video at 13:08:50; Elapsed Time Stamp 0:23:04)*.

58. That, upon arrival of a stretcher, Garren and another deputy pulled the motionless Plaintiff into the mud from the vehicle as Plaintiff groaned from the impact *(Exhibit P-1[21], McClure Body-Cam video at 13:15:18, Elapsed Time Stamp 0:29:32)*.

59. That, in the aftermath of the incident, both McClure and Garren repeatedly misrepresented that they had 'tased' Plaintiff only twice, despite Body-Cam evidence to the contrary, demonstrating an effort to minimize and conceal their use of excessive force *(Exhibit P-1[22], McClure Body-Cam video at 13:02:46; Elapsed Time Stamp 0:17:01; Exhibit P-1[23], McClure Body-Cam video at 13:06:36; Elapsed Time Stamp 0:20:49; Exhibit P-1[24], McClure at 13:09:53; Elapsed Time Stamp 0:24:07; Exhibit P-1[25], McClure at 13:12:45; Elapsed Time Stamp 0:27:00; and Exhibit P-2[10], Garren Body-Cam video at 13:08:25; Elapsed Time Stamp 0:20:16)*.

60. That McClure also obfuscated events by shifting blame for excessive 'tasing' to Garren:

   a. "I 'tased' (Plaintiff); I did two; Brady tased him; miscommunication, so we're

done with 'tasing.'" *(Exhibit P-1[26], McClure Body-Cam video 13:09:20; Elapsed Time Stamp 0:23:34)*; and

b. "…(E)ventually, I 'tase' him…I hit him again…when I said "Taser!" I don't know (if Garren) thought I meant (to) 'tase' him…on my second run, he got hit a sec…by (Garren) but I mean you can't get no more than…I mean that's…two shots at one time, but outside of that…" *(Exhibit P-1[27], McClure Body-Cam video at 13:19:13; Elapsed Time Stamp 0:33:27)*.

61. That, at all times after the incident, the Body-Cam videos were available for review by the superiors of McClure and Garren, including Sheriff Griffin.

62. That the excessive force inflicted upon Plaintiff by McClure and Garren resulted in severe injuries to Plaintiff, both temporary and permanent, including but not limited to: bone fractures; permanent head and facial disfigurement; partial loss of sight; agonizing physical pain and suffering; and severe emotional distress and mental anguish; all of which required continuous hospitalization of more than forty (40) days for surgery, rehabilitation, therapy and extended follow-up treatment; and substantially impaired his mobility, daily activities and interactions with others.

63. That Plaintiff has required substantial medical treatment, invasive and otherwise, for his multiple injuries and he has suffered, and continues to suffer, disabling pain and impairments from his injuries.

64. That all of the foregoing injuries were inflicted upon Plaintiff by McClure and Garren during Defendant's attempts to extract Plaintiff from his own vehicle lawfully parked upon his lawful premises.

65. That, at all relevant times herein, Defendant Griffin maintained 'Use-of-Force' and

-13-

"Taser" policies, which rely, in part, upon Federal Court precedent, and in pertinent part, provide:

a. "300.1 PURPOSE AND SCOPE:" Reasonable Use of Force guidance "to make…decisions in a professional, impartial, and reasonable manner…(and) apply to all policies addressing the potential use of force, including…Control Devices and Conducted Energy Device policies;"

b. "300.2 POLICY…(T)he authority to use reasonable force and to protect the public welfare requires monitoring, evaluation, and a careful balancing of all interests;"

c. "300.2.1 DUTY TO INTERCEDE AND REPORT. Any deputy who observes another law enforcement officer…use force that is potentially beyond that which is objectively reasonable under the circumstances should report…to a supervisor as soon as feasible (N.C. Gen. Stat. § 15A-401);"

d. "300.3 USE OF FORCE: …only that amount of force that reasonably appears necessary…to accomplish a legitimate law enforcement purpose (is permissible);"

e. "300.5 REPORT(S) (OF) USE(S) OF FORCE: …shall be documented promptly…;"

f. "300.7 SUPERVISOR RESPONSIBILITIES: A supervisor should respond to a reported application of force resulting in visible injury…;"

g. "303.5.1 APPLICATION OF THE CONDUCTED ELECTRICAL WEAPON (TASER): …(is only appropriate) when the circumstances…indicate that such application is reasonably necessary to mitigate a risk of immediate danger from a person:

(i) …(who) is violent or is physically resisting and poses a risk of

-14-

immediate danger…that can be mitigated by the use of the TASER;

(ii) …(or has) demonstrated…an intention to be violent or to physically resist, and reasonably appears to present a risk of immediate danger to…others;

(iii) …(or) has expressed an intent to and possesses the immediate and reasonable means to commit suicide, and the use of the TASER is reasonably likely to prevent it;

(iv) (and) …the use of the TASER on the subject is both reasonable and proportional to the resistance the subject exerts… to determine whether the use of the TASER is reasonable and proportional, a deputy should consider:

(1) The severity of the crime at issue;

(2) The extent to which the subject poses an immediate threat to the safety of deputies or others; and

(3) Whether the subject is actively resisting arrest or attempting to evade arrest by flight;" and

h. "303.5.4 MULTIPLE APPLICATIONS OF THE CONDUCTED ELECTRICAL WEAPON (TASER): … No more than *two standard cycles* will be used if (two were) not effective" (emphasis added)."

66. That Defendants McClure and Garren were trained under policies incorporating these foregoing standards.

67. That, now thoroughly incapacitated, Plaintiff was removed from his vehicle and removed from the scene by stretcher to be attended by emergency responders and taken to the

-15-

hospital *(Exhibit P-1[28], McClure Body-Cam video at 13:16:13; Elapsed Time Stamp 0:30:27)*.

68.     That Defendant Griffin was placed on actual or constructive notice by allegations, investigations, litigation, public reporting and use-of-force incidents of:

a. Use-of-force issues involving "Tasers" which existed within the Henderson County Sheriff's Office prior to Griffin's election to the Office of Sheriff (see US Dist. Ct, W.D.N.C., Asheville Division, Case No.: 1:15-cv-00132, wherein a Henderson County Deputy Sheriff used a "Taser" against a detainee of the Henderson County Detention Center); placing Defendant Griffin notice of the need/failure to train law enforcement officers in such matters;

b. Allegations of excessive force in the employment history of his new hires upon his election as Sheriff on December 6, 2018, whereupon he retained and hired law enforcement personnel with a history of using excessive force against members of the public, including:

i. Retention of Deputies With History of Excessive Force With Taser Against Individual With Mental Health Issue: An episode involving an apparent mental health or substance abuse disorder resulted in a lawsuit against, *inter alia,* Sheriff Griffin and two of his deputies in a Complaint arising from an incident approximately one month prior to Griffin taking office in which Plaintiff alleged excessive force, including the use of a "Taser" against a man in shackles and handcuffs. Under Griffin's administration, neither of those deputies were charged, disciplined or terminated. (US Dist. Ct, W.D.N.C, Asheville Division, Case No.: 1:19-cv-00137);

-16-

ii. Retention of Deputies With History of Excessive Force: On August 11, 2018, roughly four months prior to Defendant Sheriff Griffin taking office, deputies of the Henderson County Sheriff's Office, while engaged in inflicting excessive force on an individual, shot and killed his non-aggressive dog without justification. The lawsuit was filed by Plaintiff after Griffin took office. (US Dist. Ct, W.D.N.C, Asheville Division, Case No.: 1:21-cv-00217); and the deputies under Sheriff Griffin were not charged, disciplined or terminated, to the knowledge of Plaintiff;

iii. Retention of Jail Administrator With History of Excessive Force: Todd McCrain provided information to the public on the death of an inmate at the Henderson County Detention Center on July 23, 2024; although not named a defendant in the subsequent litigation, McCrain previously had been one of several detention officers named as defendants in a lawsuit under the previous Sheriff facing allegations of excessive force against a pre-trial detainee, severely injuring him (Henderson County File no. 20 CVS 12 [removed to Federal Court: US Dist. Ct., W.D.N.C., Asheville Division, Case No.: 1:20-cv-00051]); however, on January 4, 2017, McCrain was a supervisory employee in the Detention Center McCrain was a named defendant in the resulting litigation, a matter settled out-of-court; despite the allegations of excessive force lodged against him in that matter, McCrain was retained by the Griffin administration after the 2018 election and promoted.

69. That, during his administration as Sheriff, Griffin also was on actual or constructive notice through allegations, investigations, litigation, public reporting, and internal review

processes that his law enforcement personnel engaged in conduct involving allegations of excessive force, often against persons in mental health crises, and failure to follow or enforce departmental policy enacted ostensibly for the safety of the public.

70. That the incidents of which Griffin had notice, described below, establish a pattern and practice of tolerating excessive force in multiple forms toward persons in the custody and care of his law enforcement officers, including those in vulnerable circumstances, whether by medical or mental health crises or otherwise.

71. That, during Griffin's tenure as Sheriff, he was on notice through the foregoing sources that his personnel were involved in incidents constituting a recurring pattern of excessive force of which he fomented or tolerated without adequate discipline or training, including:

    a. Incident of Excessive Force: A deputy of Griffin assigned to a Blue Ridge Community College "Basic Law Enforcement Training" program, *Subject Control Arrest Techniques*, was accused of assault on a cadet he was tutoring in 2024; six instructors were suspended from the school after an investigation by The Criminal Justice Education and Training Standards Commission upon finding that the instructors were "complicit (in) egregious rule violations," (See Asheville Citizen-Times story May 30, 2024): There is no record of discipline for the subject deputy by Griffin;

    b. Incident of Excessive Force: On November 25, 2023, Griffin's deputies shot and killed a homeowner's dog while conducting an investigation of a suspicious vehicle at a person's home: The vehicle was determined to belong to the homeowner; the deputies of Griffin were not charged criminally, seriously disciplined or terminated;

c. Incident of Excessive Force Against Restrained Detainee: In 2019, the Henderson County Sheriff's Office was named as Defendant for the acts of its deputies in a Federal civil rights case alleging excessive force in that one or more detention officers had 'body-slammed' a restrained detainee, causing him to suffer bone fractures and injury. The deputies/officers involved were not charged criminally, seriously disciplined or terminated. US Dist. Ct, W.D.N.C., Asheville Division, Case No.: 1:19-cv-00183.

d. Incident of Excessive Force Against Restrained Individual with Mental Health Issue: Griffin is named in a Federal lawsuit filed by the mother of a shooting victim who arrived at the crime scene in a distraught state of mind against whom deputies of the Henderson County Sheriff's Office and others were alleged to have committed excessive force arising from members of Griffin's office and others deputies taking her to the ground and inflicting serious injury on or about November 24, 2023, (WLOS News: January 4, 2024 and March 5, 2024); the officers filed criminal warrants against the decedent's mother for assault and resisting arrest, charges later dismissed: Her lawsuit against Griffin, et al, for, *inter alia*, excessive force remains pending: No serious discipline has been imposed. See US Dist. Ct., W.D.N.C., Asheville Division, Case No.: 1:25-cv-00418; and Henderson County Case File No.: 24-CVS-000290-440;

e. Incident of Excessive Force Against Individual With Mental Health Issue: An off-duty Deputy of Griffin's office shot an autistic man experiencing an apparent mental health episode as he stood next to a parked patrol car in a Hendersonville, NC, parking lot on the morning of February 23, 2024 (WLOS News, 2/23/24;

-19-

updated 2/4/25); this matter was investigated by the State Bureau of Investigation (SBI); in light of the extra-territorial exercise of investigative jurisdiction, Griffin terminated the deputy quickly; the deputy was later convicted of Assault with a Deadly Weapon Inflicting Serious Injury (Henderson County File no.: 24CR241586-440);

f.  Incident of Excessive Force Against a Minor By Officer With History of Excessive Force: On May 9, 2022, a school resource officer employed by Griffin unnecessarily 'slammed' a 5th Grade student to the ground after the boy had failed to remove his 'hoodie' as demanded by the officer; the subject officer had been hired by Griffin despite an employment history of multiple terminations, once by the former Sheriff of Henderson County and once by the Laurel Park Police Department, resulting in litigation (Asheville Citizen-Times 10/7/2022); the resource officer was neither charged nor terminated to the knowledge of Plaintiff;

g.  Incident of Excessive Force Resulting in Death of a Restrained Individual With Mental Health Issue Involving Use of 'Taser': In 2024, Griffin's office and one of his deputies were named in a Fourth Circuit Federal lawsuit alleging, *inter alia*, excessive force (US Dist. Ct., W.D.N.C., Asheville Division, Case No.: 1:24-cv-00171), in which it is alleged that on June 15, 2022, officers used a "Taser," physical battery and restraint techniques that resulted in death of a husband and father suffering an apparent mental health crisis in public view while in the custody of both the Fletcher police and one or more of Griffin's deputies; no action was taken against the deputies y(ies) "although an autopsy…ruled the cause of death as a homicide," (source, WHKP Radio, courtesy of WLOS-13).

Shortly after the decedent's family filed the civil lawsuit, Griffin publicly absolved law enforcement and condoned their conduct, announcing that as "(t)he District Attorney found no *criminal* liability on the part of our officers…we stand behind our officers' actions;" (source *Asheville Citizen-Times*, June 11, 2024) (emphasis added), blaming the allegations of excessive force on "a litigious society," (id.); this civil rights lawsuit litigation for excessive force and failure to train was resolved by settlement and no discipline was imposed by Griffin; and

h.  Incident of Excessive Force Against Detainee Involving Use of 'Taser: ' A pre-trial detainee at the Henderson County Detention Center under Griffin allegedly was the victim of excessive force and subjected to the use of "taser" gloves; being struck in his head, back and ribs and subjected to other forms of mistreatment by multiple detention officers (US Dist. Ct., W.D.N.C., Asheville Division, Case No.: 1:23-cv-00319).

72.  That, except as alleged in the foregoing, no record of internal investigation(s) initiated in any of the foregoing incidents has been disclosed to the public.

73.  That, in the aftermath of the incident complained of, Defendants caused to be issued two criminal warrants against Plaintiff for Resisting an Officer (N.C. Gen Stat. § 14-223).

74.  That, at trial, Plaintiff was found 'Not Guilty' of the two charges of Resisting an Officer.

75.  That neither McClure nor Garren have been charged criminally and, upon information and belief, have not been meaningfully disciplined despite Defendant Griffin's ability to investigate and authority to do so, particularly in light of the Body-Cam video footage of the incident available to him.

76.  That Plaintiff is advised and believes that McClure and Garren remain employed by

-21-

Griffin despite their misconduct alleged herein.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983
Excessive Force and Unlawful Seizure
Defendants McClure and Garren
(Individual Capacities)

77. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

78. That Defendants McClure and Garren, acting under the color of State law, seized Plaintiff within the meaning of the Fourth Amendment of the United States Constitution and are sued in their individual capacities.

79. That, by the time that Defendant Griffin's Policy Manual provisions on "Tasers" were drafted (2022), one or more Federal Courts had determined that:

   a. Law enforcement officers are barred by the Fourth Amendment from use of excessive force in effectuating seizures, *Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003)*;

   b. Excessive force claims are evaluated by the courts based on a standard of objective reasonableness, *Graham v. Connor*, *490 U.S. 386, 395 (1989)*;

   c. The use of Tasers had been found to constitute 'significant force' in Fourth Amendment jurisprudence, see *Garcia v. Dutchess County, 43 F. Supp. 3d 281, 297 (S.D.N.Y. 2014)*;

   d. The Fourth Circuit has explained that "(d)eploying a taser is a serious use of force" intended to "inflict a painful and frightening blow," *Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 902 (4th Cir. 2016)* (quoting *Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008))*; and

-22-

e. "Where, during the course of seizing an out-numbered mentally ill individual who is a danger only to himself, police officers choose to deploy a taser in the face of stationary and non-violent resistance...those officers use unreasonably excessive force...law enforcement officers should now be on notice that such taser use violates the Fourth Amendment." *Armstrong, 810 F.3d at 910.*

80. That, under clearly established law, the reasonableness of force against an individual is evaluated based upon:

   a. "(T)he severity of the *crime* at issue;

   b. "whether the *suspect* poses an immediate threat to the safety of the officers or others(;) and

   c. "whether he is actively resisting *arrest* or attempting to evade *arrest* by flight," (emphasis added) *Graham, 490 U.S. at 396.*

81. That McClure and Garren failed to employ reasonable de-escalation measures, despite circumstances indicating Plaintiff might be suffering from a mental health crisis amidst the loss of his home and possessions.

82. That, notwithstanding Plaintiff's lawful behavior, Defendants nonetheless inflicted excessive force upon Plaintiff, without provocation and objectively unreasonable under all the circumstances, which includes but is not limited to, that they:

   a. Deployed and discharged their 'tasers' multiple times against a helpless and non-violent individual;

   b. Used physical strikes to commit battery against Plaintiff, including forceful kicks to his body; and

   c. Forcibly attempted a physical extraction of Plaintiff from his motor vehicle in a

-23-

manner which caused him substantial physical injury and exacerbated his injuries.

83. That each successive "Taser" deployment by McClure and Garren against Plaintiff constituted an independent and escalating use of excessive force.

84. That, in addition, McClure and Garren had no justifiable cause to deploy their "Taser" weapons, much less to do so in excess of that permitted by policy and training.

85. That the deployment of tasers by law enforcement has been subject to strict scrutiny by the Courts under the Fourth Amendment's protection from unreasonable seizures holding, *inter alia*, that such use of force be proportionate to the threat faced by law enforcement; repetitious deployment of 'tasers' against mentally ill, non-violent persons who are not engaged in criminal conduct has been found to violate "clearly established" constitutional rights of an individual.

86. That, by April 30, 2024, it was clearly established in the Fourth Circuit that repeated taser deployment against a non-violent, mentally ill individual who poses no immediate threat and neither is actively resisting or fleeing constitutes excessive force in violation of the Fourth Amendment. See *Armstrong, 810 F.3d at 910*; see also *Jones, 325 F.3d at 527.*

87. That a reasonable law enforcement officer would have known that the use of excessive force and repeated deployment and discharge of a "Taser" or "Tasers" under the foregoing circumstances was unlawful.

88. That the force used to seize Plaintiff was objectively unreasonable under the totality of the circumstances and this case presents circumstances materially similar to those addressed in *Armstrong,* as Plaintiff was, as previously described:

    a. Substantially stationary, unarmed and non-violent;

    b. Suffering from a diagnosed mental health condition;

-24-

c. No immediate threat; and

d. Not resisting or fleeing.

89. That, under the foregoing circumstances, no reasonable officer would conclude that Plaintiff posed an immediate threat to the safety of law enforcement or others.

90. That the conduct of McClure and Garren exceeded the scope of their lawful authority as it was willful, wanton and malicious, and/or in reckless and conscious disregard or deliberate indifference of the rights, safety and privileges of Plaintiff, particularly in light of his need for critical and essential assessment and treatment from the outset; and served no legitimate law enforcement objective in violation of 42 U.S.C. Section 1983; as such, their conduct was sufficient to defeat any claim of public official immunity that might otherwise shield them from liability to Plaintiff as alleged herein.

91. That Plaintiff suffered severe injuries and damages as a direct and proximate result of said Defendants' misconduct in violation of his constitutional rights; and he has suffered public humiliation, loss of enjoyment of life and economic loss.

92. That, following the unlawful seizure of Plaintiff, McClure and Garren, without probable cause and with malice, instituted, procured and participated in a malicious prosecution of Plaintiff on two charges of Resisting Officers (N.C. Gen. § Sec. 14-223), which were resolved in favor of Plaintiff; cognizable as a Fourth Amendment violation under Section 1983. The resulting criminal proceedings terminated in Plaintiff's favor.

93. That Defendants' misconduct, in their individual capacities, entitle Plaintiff to relief from Defendants, jointly and severally, including but not limited to: Monetary Damages; Punitive Damages; and Attorneys Fees.

## <u>SECOND CAUSE OF ACTION</u>
42 U.S.C. §1983-Monell

-25-

94. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

## A. Governing Legal Standard

95. That Defendant Griffin is the final policymaker for law enforcement practices within the Sheriff's Office, including use-of-force policies, training, supervision, discipline, and review of officer conduct.

96. That the final policymaker is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) when an official policy, custom, or practice is the moving force behind a constitutional violation and is the result of:

    a. persistent and widespread practice or custom;

    b. actual or constructive notice; and

    c. deliberate indifference.

## B. Clearly Established Constitutional Limits (Notice)

97. That, on the subject incident date, the constitutional limits on the use of "Tasers" were clearly established in the Fourth Circuit as set forth above.

98. That, in particular, *Armstrong* placed law enforcement agencies on explicit notice that "Taser" use in response to stationary, non-violent resistance by a mentally ill individual is constitutionally excessive.

99. That these principles were incorporated into Defendant Griffin's own written policies governing use of force and taser deployment.

## C. Unconstitutional Custom and Pattern of Conduct

-26-

100. That Plaintiff incorporates herein the prior incidents alleged in the foregoing Paragraphs 68-71; those incidents establish a persistent and widespread custom of excessive force, inadequate training and discipline, and deliberate indifference to constitutional violations.

101. That from the previous incidents of excessive force incorporated herein, occurring over multiple years and involving factually similar uses of unconstitutional significant force, a consistent pattern emerges:

    a.    Deputies repeatedly and improperly using significant force, including but not limited to "Tasers;"

    b.    Use of "Tasers" as tools for compliance rather than force of 'last resort';

    c.    Frequency of escalation of force;

    d.    Often against non-violent or restrained and helpless individuals, frequently in mental health contexts;

    e.    Such incidents are followed by a failure to discipline meaningfully or retrain adequately; and

    f.    Public or internal responses by the Sheriff's Office that defended, minimized  or ignored officer misconduct.

### D. Notice to the Final Policymaker

102.  That Defendant Griffin had actual or constructive knowledge of this pattern through:

    a.    Internal reports and use-of-force reviews required by departmental policy;

    b.    Review of body-camera footage documenting officer conduct available by policy;

    c.    Civil litigation naming the Sheriff's Office and its deputies;

    d.    Media reports and publicized incidents involving excessive force; and

    e.    His authority and obligation to supervise, investigate, and discipline deputies.

-27-

103. That Griffin knew that deputies were engaging in misconduct, but, despite this knowledge, Defendant Griffin failed to take adequate corrective action.

### E. Deliberate Indifference

104. That the need for training and supervision was an obvious need of his Office.

105. That, despite notice, Defendant Griffin failed to:

   a. Train his officers appropriately; or

   b. Discipline his officers meaningfully.

### F. Failure to Train and Supervise

106. That Defendant Griffin failed to adequately train and supervise deputies, including Defendants McClure and Garren, in:

   a. Constitutional limits on the use of force;

   b. Proper and lawful deployment of tasers;

   c. Recognition and handling of individuals experiencing mental health crises;

   d. Techniques designed to reduce harm to individuals they encounter; and

   e. Alternatives to force in non-threatening situations.

107. That this failure to train and supervise was not merely negligent, but reflected a conscious disregard of a known risk that deputies would violate constitutional rights.

### G. Ratification

108. That Defendant Griffin's policies were adopted to ensure review of incidents of deployment of "Tasers" and 'tasing' incidents; Griffin and his Internal Affairs administration reviewed and/or had the authority to review the body-cam video footage and take disciplinary action in the immediate aftermath of the subject incident but failed to take such measures against McClure and Garren.

109. That McClure and Garren provided inaccurate and, alternately, incomplete information to other law enforcement officers as to their misconduct, which obfuscation was belied by Body-Cam video footage available to Griffin and his Internal Affairs administration; their failure to take substantial disciplinary action on the available evidence ratified the misconduct of the subject Defendants and their attempts to conceal their actions.

110. That Griffin's hiring and retention practices set forth above reflect his willingness to overlook past employment histories of excessive force and thereby ratified his employees' misconduct.

111. That Griffin's history of public refutation of charges of police misconduct prior to litigation and failure to adequately discipline and train officers after incidents of excessive force has ratified such misconduct and increased the risk of recidivism within law enforcement ranks, endangering the public.

112. That Griffin's actions and omissions constitute ratification of McClure and Garren's misconduct under applicable Section 1983 standards and signaled to his deputies that similar conduct would be tolerated in the future.

### H. Causation ("Moving Force")

113. That the unconstitutional customs, practices, and failures described herein were the direct and proximate cause of the violation of Plaintiff's rights and injuries.

114. That the foregoing provides compelling evidence that Griffin's policies and customs were the moving force behind the violation of Plaintiff's rights.

### I. Damages and Relief

115. That, as a direct and proximate result of Defendant Griffin's unconstitutional policies, customs, and practices, Plaintiff suffered severe physical injuries, emotional distress, and other damages.

116. That Defendant Griffin's improper actions were within the scope and authority of his official capacity and were an actual proximate cause of Plaintiff's serious injuries.

117. That Plaintiff is entitled to recover all damages available under 42 U.S.C. § 1983, including, but not limited to compensatory damages, attorneys' fees, and declaratory relief.

**THIRD CAUSE OF ACTION**
Defendants McClure and Garren
Civil Assault and Battery
(Individual Capacities)
And Defendant Griffin
Respondeat Superior
(Official Capacity)

118. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

119. That, on the date of the subject incident, Defendants McClure and Garren were on the premises of Plaintiff and were engaged in conduct the purpose of which was to accomplish their duties of employment with Defendant Griffin.

120. That Defendants, together and separately, intentionally used force against Plaintiff without lawful justification, causing Plaintiff reasonable apprehension of immediate harmful and offensive contact and did result in actual physical battery to Plaintiff, directly and proximately causing him serious, substantial and severe injuries and damages.

121. That the force used by Defendants, acting separately and together, was excessive and not reasonably necessary under the circumstances.

-30-

122. That Defendants' misconduct constitutes violations of common law under the laws of the State of North Carolina and was intentional, malicious, willful, wanton and/or in reckless disregard, or deliberate indifference, of the rights, safety and privileges of Plaintiff.

123. That the misconduct of McClure and Garren occurred while they were acting under color and scope of assigned duties notwithstanding unlawful conduct.

124. That, as to the State common law claims alleged herein, the acts of Defendants McClure and Garren are attributable to the affirmative acts and omissions of the Sheriff under the doctrine of *respondeat superior* and, therefore, Griffin, as principal, is liable for the acts and omissions of his agents/deputies acting within the course and scope of their employment and while performing duties assigned by the Sheriff.

125. That the injuries and damages suffered by Plaintiff were the direct and proximate result of the misconduct of Defendants McClure and Garren in their individual capacities and Sheriff Griffin in his official capacity, and entitle Plaintiff to compensatory damages from Defendants, jointly and severally, and punitive damages from McClure and Garren, jointly and severally.

### FOURTH CAUSE OF ACTION
Defendants McClure and Garren
Intentional Infliction of Emotional Distress
(Individual Capacities)

126. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

127. That the actions of Defendants McClure and Garren against Plaintiff in repeatedly using significant force against a non-violent individual suffering from a long-term mental health condition which caused him to be deeply fearful and suspicious of law enforcement personnel but who otherwise posed no immediate threat, were extreme and

-31-

outrageous; and exceeded all bounds of objective reasonableness.

128. That Defendants intended to cause, or recklessly disregarded the likelihood of causing, Plaintiff severe emotional distress.

129. That the actions and conduct of said Defendants did directly and proximately cause severe emotional distress to Plaintiff, requiring treatment.

130. That, as set forth above, Defendant Griffin, condoned and ratified the misconduct of McClure and Garren, creating and encouraging an environment which fomented and cultivated a culture in which such conduct was acceptable within the Henderson County Sheriff's Department.

131. That Defendant Griffin is liable for the acts or omissions of his deputies/law enforcement subordinates as he is for his own.

**FIFTH CAUSE OF ACTION**
Defendants McClure and Garren
Malicious Prosecution
(Individual Capacities)

132. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

133. That Defendants McClure and Garren, having neither a warrant in their possession for Plaintiff's arrest nor a crime committed in their presence to justify an arrest, initiated and participated in prosecution of criminal proceedings against Plaintiff with malice for Resisting an Officer (N.C. Gen. Stat. § 14-223), despite the absence of any lawful basis therefor, for the purpose of justifying their use of force.

134. That, under North Carolina law, individuals are entitled to resist the unlawful actions of law enforcement officers acting outside the scope of their duties and it is outside the scope of their duties for such officers to engage in unlawful seizures of individuals in

-32-

violation of their constitutional rights.

135. That McClure and Garren seized Plaintiff unlawfully without probable cause.

136. That McClure and Garren had no probable cause to initiate prosecution against Plaintiff and no reasonable officer could believe that probable cause existed for prosecution of Plaintiff.

137. That the afore-referenced proceeding was resolved by termination in favor of Plaintiff with verdicts of "Not Guilty" in both charges.

138. That Plaintiff was damaged as a direct and proximate result of Defendants' malicious prosecution and is entitled to recovery from Defendants, jointly and severally, of compensatory damages and punitive damages.

### SIXTH CAUSE OF ACTION
Griffin and The Surety
Action Under The Bond
(N.C. Gen. Stat. §§ 162-8; 162-12 and 58-76-5)

139. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

140. That Plaintiff brings this claim against Defendant Griffin and The Surety under the Sheriff's surety bond pursuant to N.C. Gen. Stat. § 58-76-5 for damages suffered by Plaintiff from acts of excessive force by Defendants under 42 U.S.C. § 1983 and/or State claims under common law.

141. That, at all relevant times, Defendant Griffin was bonded as required by North Carolina law.

142. That the neglect and misconduct of Defendants as alleged hereinabove constitute conduct within the scope of the bond statutes.

143. That the Surety is liable for Plaintiff's injuries and damages directly and proximately

-33-

caused by Defendants.

144. That Plaintiff is entitled to recover on the bond all damages as allowed by law caused by the neglect, misconduct and malfeasance set forth hereinabove of the Sheriff and his agents, at least to the extent of the amount of the bond. Such damages substantially are in excess of $25,000.00 and Plaintiff may sue repeatedly on the bond until the judgment is paid.

**SEVENTH CAUSE OF ACTION**
Defendants Griffin, McClure and Garren
Violation of Article I, Section 19 of the North Carolina Constitution
(Individual and/or Official Capacities)

145. That Plaintiff herein re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

146. That Defendant Sheriff is directly and independently liable in his official capacity for his failure to train, supervise and direct Defendants McClure and Garren.

147. That Plaintiff asserts this claim solely in the alternative. To the extent any state-law tort remedy is barred by governmental immunity, public official immunity, sovereign immunity, bond limitations, or any other immunity doctrine, Plaintiff lacks an adequate state remedy and is entitled to pursue direct relief under Article I, Section 19 of the North Carolina Constitution.

148. That the adequacy of alternative remedies cannot be determined at the pleading stage because Defendants have not yet asserted immunity defenses, if any.

149. That Plaintiff is entitled to recover his actual damages proximately and directly caused by the conduct of the Defendants, jointly and severally.

**JURY DEMAND**

150. That Plaintiff seeks and requests that all issues be tried before a jury.

-34-

**WHEREFORE,** Plaintiff respectfully prays the Court that Plaintiff have and recover as follows:

1. Of and from Defendant Griffin, in his official capacity, and his Surety, compensatory damages recoverable as by law allowed;

2. Of and from McClure and Garren in their individual capacities, jointly and severally, all compensatory damages recoverable as by law allowed;

3. For an award of punitive damages against McClure and Garren as provided under Federal law, N.C. Gen. Stat. Chapter 1D and otherwise as by law allowed;

4. That the costs of this action, including pre-judgment and post-judgment interest and reasonable attorneys' fees as by law allowed, including but not limited to 42 U.S.C §1988, be taxed to Defendants, jointly and severally;

5. For a trial by jury; and

6. For such other and further relief as the court deems just and proper.

Respectfully submitted, this the 15th day of June, 2026.

THE BIDWELL LAW FIRM, PA

*s Paul L. Bidwell*
Paul Louis Bidwell
State Bar # 12868
Attorney for Plaintiff
207 Hillside Street
Asheville, North Carolina 28801
paul@thebidwelllawfirm.com
(828) 252-0490  Fax: (828) 412-4390

# ALLEN v. GRIFFIN, et al

# EXHIBIT INDEX

## Exhibit P-1 - McClure Body-Worn Camera Footage

| Exhibit No. | Source Video | Time of Recording | Elapsed Time Stamp | Claim No. | Description |
|---|---|---|---|---|---|
| P-1[1] | McClure Body-Cam | 12:48:20 | 0:02:34 | 25 | McClure arrives and asks, "Where's your pissed off person?" |
| P-1[2] | McClure Body-Cam | 12:49:43 | 0:03:57 | 26 | First responders advise Plaintiff is fearful and confused. |
| P-1[3] | McClure Body-Cam | 12:51:17 | 0:05:31 | 26 | Individual advises Plaintiff may be experiencing mental health crisis. |
| P-1[4] | McClure Body-Cam | 12:48:09 | 0:02:23 | 28 | Scene conditions; fire substantially contained. |
| P-1[5] | McClure Body-Cam | 12:49:12 | 0:03:27 | 30 | Deputies knew Plaintiff's identity and residence. |
| P-1[6] | McClure Body-Cam | 12:51:56 | 0:06:10 | 30(b) | Plaintiff is seated in vehicle not in gear and without keys. |
| P-1[7] | McClure Body-Cam | 12:52:40 | 0:06:54 | 30(c) | Wheel chock visible. |
| P-1[8] | McClure Body-Cam | 12:51:37 | 0:05:51 | 31 | McClure states Plaintiff will be removed peacefully or otherwise. |
| P-1[9] | McClure Body-Cam | 12:53:13 | 0:07:28 | 33 | McClure orders Plaintiff: "Get the f*** out of the car, NOW!" |
| P-1[10] | McClure Body-Cam | 12:53:20 | 0:07:34 | 33 | McClure instructs Garren to stop talking. |
| P-1[11] | McClure Body-Cam | 12:52:47 | 0:07:01 | 38(c) | Plaintiff seated and non-violent. |
| P-1[12] | McClure Body-Cam | 13:18:08 | 0:32:22 | 39 | Plaintiff references fear of "snipers." |
| P-1[13] | McClure Body-Cam | 12:55:00 | 0:09:14 | 41 | First Taser deployment by McClure. |
| P-1[14] | McClure Body-Cam | 12:55:21 | 0:09:35 | 43 | McClure orders second Taser deployment. |
| P-1[15] | McClure Body-Cam | 12:55:41 | 0:09:55 | 45 | Third Taser deployment ordered. |
| P-1[16] | McClure Body-Cam | 12:56:31 | 0:10:45 | 47 | McClure attempts verbal persuasion after injuries observed. |

-1-

| Exhibit No. | Source Video | Time of Recording | Elapsed Time Stamp | Claim No. | Description |
|---|---|---|---|---|---|
| P-1[17] | McClure Body-Cam | 12:55:58 | 0:10:13 | 47 | McClure attempts forcible extraction by leg. |
| P-1[18] | McClure Body-Cam | 12:57:25 | 0:11:38 | 52 | McClure kicks Plaintiff while Plaintiff screams/pleads. |
| P-1[19] | McClure Body-Cam | 12:58:30 | 0:12:44 | 53 | Vehicle door slammed on Plaintiff's ankle and foot. |
| P-1[20] | McClure Body-Cam | 13:08:50 | 0:23:04 | 57 | McClure's indifference to Plaintiff's injuries. |
| P-1[21] | McClure Body-Cam | 13:15:18 | 0:29:32 | 58 | Plaintiff Pulled Motionless from Vehicle. |
| P-1[22] | McClure Body-Cam | 13:02:46 | 0:17:01 | 59 | Statement obfuscating number of Taser deployments. |
| P-1[23] | McClure Body-Cam | 13:06:36 | 0:20:49 | 59 | Additional statements of obfuscation. |
| P-1[24] | McClure Body-Cam | 13:09:53 | 0:24:07 | 59 | Additional statements of obfuscation. |
| P-1[25] | McClure Body-Cam | 13:12:45 | 0:27:00 | 59 | Additional statements of obfuscation. |
| P-1[26] | McClure Body-Cam | 13:09:20 | 0:23:34 | 60(a) | McClure attempts to shift responsibility to Garren. |
| P-1[27] | McClure Body-Cam | 13:19:13 | 0:33:27 | 60(b) | McClure obfuscation of Taser events. |
| P-1[28] | McClure Body-Cam | 13:16:13 | 0:30:27 | 67 | Plaintiff removed from scene by stretcher. |

## Exhibit P-2 – Garren Body-Worn Camera Footage

| Exhibit No. | Source Video | Time of Recording | Elapsed Time Stamp | Claim | Description |
|---|---|---|---|---|---|
| P-2[1] | Garren Body-Cam | 12:53:57 | 0:05:47 | 39 | Plaintiff in panic pleads for explanation and expresses fear. |
| P-2[2] | Garren Body-Cam | 12:51:02 | 0:02:52 | 39 | Discussion referencing "snipers." |
| P-2[3] | Garren Body-Cam | 12:57:03 | 0:08:53 | 48 | Garren announces intent to Taser dog. |

| Exhibit No. | Source Video | Time of Recording | Elapsed Time Stamp | Claim | Description |
|---|---|---|---|---|---|
| P-2[4] | Garren Body-Cam | 12:57:06 | 0:08:56 | 49 | Taser deployment against dog. |
| P-2[5] | Garren Body-Cam | 12:57:10 | 0:09:00 | 49, 51 | Garren instructs McClure to remove Plaintiff. |
| P-2[6] | Garren Body-Cam | 13:00:25 | 0:12:15 | 54 | Plaintiff collapsed in vehicle. |
| P-2[7] | Garren Body-Cam | 13:07:40 | 0:19:30 | 55 | Discussion of shooting dog. |
| P-2[8] | Garren Body-Cam | 13:12:29 | 0:24:19 | 55 | Animal Control arrives and removes dog without incident. |
| P-2[9] | Garren Body-Cam | 12:57:44 | 0:09:34 | 56 | Garren asks for assistance; First Responders and officers present offer no assistance. |
| P-2[10] | Garren Body-Cam | 13:08:25 | 0:20:16 | 59 | Garren statements regarding Taser use. |